UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JAMES B. GRAHAM,                          )
                                          )
                    Plaintiff,            )
                                          )
          vs.                             )        No. 1:15-cv-01594-LJM-DML
                                          )
CAROLYN W. COLVIN Acting                  )
Commissioner of the Social Security       )
Administration,                           )
                                          )
                    Defendant.            )

## ENTRY ON JUDICIAL REVIEW

Plaintiff James B. Graham   requests judicial review of the final decision of
Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (the
"Commissioner"), which denied Graham's applications for Disability Insurance Benefits
("DIB") and Supplemental Security Income ("SSI") benefits under titles II and XVI of the
Social Security Act, 42 U.S.C. §§ 416, 423, & 1382c.   Graham contends that the
Administrative Law Judge ("ALJ") failed to properly consider his left leg wound with
respect to his residual functional capacity when the ALJ deemed the wound non-severe.
Graham further alleges that the ALJ did not adequately account for Graham's social
limitations in determining his residual functional capacity.   For the reasons set forth below,
the Commissioner's decision is **AFFIRMED**.

# I. BACKGROUND

## A. PROCEDURAL HISTORY

On July 24, 2012, Graham filed applications for DIB and SSI, alleging disability beginning July 15, 2008. R. at 184-91.  Graham alleges disability due to symptoms associated with personality disorder with avoidant and paranoid features, dysthymic disorder, generalized anxiety disorder, lumbar degenerative disease, left leg peripheral neuropathy, bilateral peripheral artery disease, and a left leg non-healing wound.  R. 277, 281.  Graham's applications were initially denied and upon reconsideration, at which point he requested a hearing before an ALJ. R. at 115-22, 126-43.

The hearing before the ALJ took place on February 26, 2014, at which Graham, who was represented by counsel, and a vocational expert testified. R. at 42-68.  On May 23, 2014, the ALJ issued a decision finding Graham was not disabled. R. at 19-41.  The Appeals Council denied Graham's request for review, making the ALJ's determination the final decision of the Commissioner. R. at 5-10; 20 C.F.R. §§ 404.955, 404.981, 416.1455, & 416.1481.

On October 9, 2015, Graham filed the instant appeal pursuant to 42 U.S.C. §§ 405(g) & 1383(c)(3).

## B.  AGE, EDUCATION, WORK HISTORY &
## GRAHAM'S PERCEPTION OF HIS IMPAIRMENTS[1]

Graham was fifty-one years old at the time of the alleged onset date of July 15, 2008.  Graham has a GED and has past relevant work as an auto mechanic. R. at 48. Graham testified at the hearing that the primary reason he was not able to work was due to depression. *Id.*  He described the severity of his depression as an eight out of ten and testified that it was the same in 2008. R. at 48-49.  Since 2010, Graham has taken medication to relieve his depression, which has resulted in some improvement. R. at 49-50.  Graham testified that his depression medications affect his memory and causes his mind to wander. R. at 51.  He also stated that he was seeing a medical doctor every two months, but had never received mental health therapy with a counselor or therapist. R. at 50.

Graham indicated that, because of the depression, he does not set goals or look forward to or feel anything. R. at 52.  He also stated that he does not "do crowds" and has difficulty trusting people he is not acquainted with. *Id.*  Graham stated that he gets uncomfortable when six or seven people are around him. *Id.*  Graham admitted that he has had prior altercations with strangers, but none have resulted in physical "blows" since

---

[1] The Court admonishes both parties for their recitation of facts, or lack thereof, provided to the Court.  Graham's brief describes his lengthy medical history, but, despite the six year period from the alleged onset date to the hearing in front of the ALJ, fails to set forth dates or context that would assist the Court in assessing the ALJ's opinion – which is in part decided on an issue of timeliness.  The Commissioner, on the other hand, simply incorporated the facts set forth by the ALJ.  This resulted in a significant amount of wading through the record to ensure that this Court had an objective basis for its decision.  Future briefs utilizing this method will be struck and the offending party will be asked to file a revised brief in short order.

high school. R. at 53.  He also testified that he has had trouble with authority in the past, which has resulted in the loss of many jobs. R. at 53-54.

Graham stated that, since approximately June 2013, he quit drinking alcohol entirely. R. at 54.

Graham further testified about problems he had with his left leg, following a surgery in 2013. R. at 57.  On the day of the hearing, Graham was wearing a wound vac to assist with circulation. R. at 55.  He received various treatments for the leg in addition to antibiotics, including debriding. *Id.*  Graham initially had an operation on the leg, which resulted in an infection. R. at 56.  He was assigned a wound specialist, who he had seen every two weeks since receiving the wound, but had not seen her in "about a month." *Id.* Graham also received a visiting nurse three times a week in order to change the bandage, take vitals, and ensure that the wound did not become infected. *Id.*

Graham testified that since November 2011,[2] when he had his first surgery on his right leg – which is not at issue in this case – that standing for twenty minutes "is pushing it" but that he can sit without affect, except for his foot falling asleep. R. at 57-58.  Prior to November 2011, he could stand for "[p]robably 20 minutes or so." *Id.*  Graham also testified that, before his most recent surgery he would only be able to lift approximately twenty pounds because of his legs and because he is not as strong as he used to be. R. at 60-61.

---

[2] There was evidence mentioned by Graham's attorney that two leg surgeries occurred on each leg, the first of which was stenting to the right leg, lower extremity. R. at 57.  The second surgery was performed in 2013. *Id.*  The ALJ did not distinguish between the two surgeries or legs, and relied on the dates that the surgeries occurred to question Graham about his physical abilities post-November 2011 when the first surgery occurred on the right leg. R. at 57-58.

Graham testified that his pain was a five out of ten with medications. R. at 58-59. He claimed that moving increases his pain. R. at 59.  Graham stated that the current wound problem resulted from his last surgery.  *Id.*  He indicated that, prior to the surgery, his foot would fall asleep for long periods or his whole leg would fall asleep if he laid down, which forced him to sleep upright in a chair. *Id.*  Graham stated that following the surgery, his leg was swollen and twice as large. R. at 60.  He also testified that he has had stints placed in both of his legs, and multiple operations performed on his left leg. *Id.*

## C.  RELEVANT MEDICAL EVIDENCE

### 1.  Treatment Records – Physical Impairments

Graham had right and left SFA recanalization and stenting in November 2011 due to claudication and bilateral peripheral artery disease. R. at 375-416.

On January 30, 2013, Graham underwent a CT angiogram after a Doppler report showed a decrease in ABI (ankle brachial index), which was reduced to 0.19 on the left. R. at 506. Findings showed status post stenting of the entire left SFA with complete occlusion throughout the stented portion and progressive mild to moderate multifocal stenosis of the popliteal artery, reconstitution of the distal SFA above the knee with essentially three-vessel runoff to the left foot, status post stenting of the entire right SFA which is widely patent with three-vessel runoff to the right foot, and a stable indeterminate 1.5 cm left adrenal nodule. R. at 507.

From March 29, to April 1, 2013, due to the occlusion, Graham was admitted to the VA clinic and underwent a surgical bypass graft. R. at 73, 539.  He was then referred to physical therapy for evaluation and treatment of his strength and mobility. R. at 555. Graham was able to perform functional mobility at a moderate independent level with a

front wheeled walker and had a slow gait secondary to pain. R. at 556. He was not assigned to continue physical therapy and was discharged with a front wheeled walker for ambulation. *Id.* The following month it was noted that his ABI had improved to 0.81 on the right and 0.66 on the left, and he was noted to have trifurcation disease by pressures only with mild distal ischemia at rest. R. at 568. On June 4, 2013, Graham presented with left lower extremity edema and the incision made in the prior surgery remained open in his groin. R. at 565.

On August 20, 2013, Graham was admitted for wound healing difficulty in the left leg. R. at 706. Blood flow in the left leg was diminished. *Id.* The graft was opened up and resulted in improved blood flow. *Id.* Graham was released from the hospital on August 24, 2013. *Id.*

On December 11, 2013, approximately nine months after the original surgery, Graham was again hospitalized for a chronic non-healing incision of the left leg and swelling. R. at 1018-19. Graham stated that he had had the chronic left total leg edema since March 2013. R. at 1018. An EMG was performed which revealed the left tibial and peroneal motor nerves were nonresponsive, a great deal of edema was present distally in the left lower extremity from the site of the open wound, and the right peroneal motor nerve was very low in amplitude and slowed in conduction velocity. R. at 1034. Graham's leg was very taught and swollen, with limited bending at the knee and mobility limitation, and a great deal of pain. R. at 1035, 1071. Graham stated that his pain is worse in the supine position or when elevating it. R. 1075.

In January 2014, Graham underwent surgical debridement of the wound. R. at 1125. Graham indicated that he did not believe that the wound was getting any worse.

*Id.* On February 7, 2014, the home care nurse stated that she observed that the wound was no longer infected as of February 7, 2014. R. at 1126.

## 2. <u>Treatment Records – Mental Impairments</u>

Graham was seen for an initial psychiatric evaluation with Dr. Mary Weber on June 30, 2012. R. at 300. Regarding medication, Graham had started on Celexa but it made him jittery and caused nightmares. *Id.* He was then switched to Zoloft which caused other negative side effects but did help him to feel "on an even keel." R. at 301. It was noted that he has been diagnosed with a delusional system as well as paranoid personality disorder and felt that Risperdal had helped him feel more at ease. *Id.* He experienced periods of difficulty sleeping, but Trazodone helps his sleep some. *Id.* He reported a chronic feeling of emptiness and detachment from others, and had a hard time feeling emotion. *Id.* Graham turned to alcohol to "let it all go and relax." *Id.* Graham reports that short term memory loss had been an issue which he thinks might be related to medication side effects. *Id.* Graham also mentioned chronic interpersonal conflicts in the workplace leading to many jobs over the years. R. at 303. Graham was diagnosed with dysthymia, alcohol abuse, nicotine and caffeine dependence, paranoid personality disorder, and assigned a GAF of 55.[3] R. at 305.

---

[3] For ease of reference, the Court incorporates the ALJ's explanation of the GAF score, R. at 31: Official notice is taken that global assessment of global assessment of functioning, the Axis V diagnosis of the *Diagnostic Statistical Manual of Mental Disorders, 4th Edition, Text Revision* (DSM-IV-TR (2000), is a clinician's subjective opinion of the psychological, social, and occupational functioning of adults. GAF is divided into 10 ranges of functioning on a descending scale from 100 (no functional problems or superior functioning in several areas) to 1 (Persistent danger of severely hurting self or others OR persistent inability to maintain minimum personal hygiene OR serious suicidal act with clear expectation of death). The ranges pertinent to this decision are: <u>51 to 60:</u> Moderate symptoms OR any moderate difficulty in social, occupational, or school functioning. <u>41 to 50:</u> Serious symptoms OR any serious impairment in social, occupational, or school

Graham sought treatment for mental impairment at the Indianapolis VA clinic throughout 2012 and 2013, as well as in January 2014. *See generally* R. at 434-642, 978-1113.

In a follow-up examination with Dr. Weber on June 18, 2013, Graham reported being "on a nice even keel" and that he was sleeping approximately seven hours per night. R. at 572.  He was noted make better eye contact, to have soft speech, to have a slightly brighter affect, a depressed mood, better judgment, poor insight, and to maybe be a little more conversant. R. at 573.  Graham's GAF score was a 58. R. at 572.

Graham's last psychiatric visit to Dr. Weber occurred on January 10, 2014. R. at 1071.  His last review took place on June 18, 2014. R. at 1070.  Dr. Weber noted that Graham was "doing quite well" from a mood standpoint and that his depression and anxiety were well managed. *Id.*  Graham indicated that he was sleeping better and woke up feeling rested. R. at 1072.  Dr. Weber gave Graham an improved GAF score of 60. R. at 1070.

---

functioning.  <u>31 to 40:</u> Some impairment in reality testing or communication OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

GAF scores are a "snapshot" in time. *Anderson v. Astrue*, 2010 WL 3522574, at *8 (N.D. Ind. 2010).  They "are 'useful for planning treatment,' and are measures of both severity of symptoms and functional level." *Denton v. Astrue*, 596 F. 3d 419, 425 (7th Cir. 2010) (citing DSM-IV-TR 32).  However, the GAF score "does not reflect the clinician's opinion of functional capacity. *Id.* at 425.   "Accordingly, 'nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score.'" *Id.* at 425 (citing *Wilkins v. Barnhart*, 69 Fed. Appx. 775, 780 (7th Cri. 2003)); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)).

### 3. <u>Social Security Administration Consultative Exams</u>

As part of his application for disability, Graham underwent a consultative physical examination on November 2, 2010. R. at 277.  Graham was claiming disability due to COPD, peripheral arterial disease, and depression. *Id.*  He complained of "leg swelling, pain in legs with walking, shortness of breath and dyspnea exertion, coughing and wheezing." *Id.* Graham stated that he had not seen a physician since 2001. *Id.* He stated that he can only walk half a block before he experiences leg pain and shortness of breath. *Id.* Graham could stand for thirty minutes at a time and lift ten to fifteen pounds with each arm. *Id.* Graham had a history of smoking two packs a day for forty years and consumes ten to twelve drinks per week. *Id.*  The examiner found symptoms of "hypertension, varicose veins, decreased breath sounds in the lung fields, shortness of breath at the end of the exam and displaced PMI." R. at 279.  The examiner also concluded that Graham "likely has hypertensive cardiomyopathy, COPD, peripheral arterial disease that may be leading to varicose veins, and claudication." *Id.*  He believed that Graham might have difficulty working a job that required walking, strenuous activity, or standing on his feet for long periods. *Id.*

On November 11, 2010, Graham also underwent a mental status examination as part of his application for disability. R. at 280.  At the examination, Graham indicated that he cannot properly function anymore or keep a job over a year. *Id.*  Graham reported a history of current and past alcohol dependence. *Id.*  The examiner diagnosed Graham with DSM-IV diagnoses of alcohol dependence, rule out alcohol induced mood disorder v. dysthymia, as well as rule out personality disorder, NOS, cluster A features. R. at 284. The examiner gave Graham a GAF score of 60. *Id.*

On August 27, 2012, Graham was referred for another consultative mental status examination in partial fulfillment of his application for benefits. R. at 422.   Graham indicated that he had difficulty trusting others, which was the result of fighting during his childhood. R. at 422-23.  He stated that he was depressed for much of his life and found difficulty enjoying himself. R. at 423.  Graham mentioned that his sleep has improved with medication. *Id.*  He also noted anxiety, worry, and self-esteem issues. *Id.*  The examiner noted Graham's alcohol history and that Graham only drank "about once a week." R. at 426.

The examiner found that Graham "carries a diagnosis of Personality Disorder with Avoidant and Paranoid Features as well as Dysthymic Disorder and Generalized Anxiety Disorder." R. at 431.  He concluded that Graham had no issues with his memory and could learn, remember, and comprehend simple instructions. R. at 431-32.  Throughout the examination, Graham was able to attend to conversation and appropriately and timely respond when prompted. R. at 432.  The examiner also found that Graham's "main source of dysfunction lies in his profound social detachment.  His guarded and detached nature would make it difficult for him to appropriately manage relationships with coworkers and clients." *Id.*   The examiner suggested that Graham "appears capable of adequate functioning in typical work environments, doing better in positions that require less interpersonal interaction." *Id.*  Finally, the examiner gave Graham a GAF score of 58.

Also on August 27, 2012, Graham underwent another consultative physical exam for his disability application. R. at 417.  At the examination, however, the majority of Graham's complaints were mental in nature. R. at 417-20.  The examiner noted that

Graham had a major surgery for "vein stripping of legs." R. at 417.  He also noted a past medical history of hypertension. *Id.*

### D.  VOCATIONAL EXPERT TESTIMONY

Vocational expert ("VE") Ray Burger testified at the February 26, 2014 hearing. R. at 61-66.  The VE testified that he had reviewed Graham's past relevant work as an auto mechanic, which he classified as DOT 620.261-010, medium, SVP-7. R. at 62.  The VE stated that the mechanical skills were transferable at the medium level. *Id.*

The ALJ posed various hypotheticals to the VE in accordance with the exertional levels, postural activities, as well as the words frequently and occasionally as used in accordance with the Social Security regulations. R. at 62-63.  The ALJ first inquired whether a person with a high school education, who could perform work at the medium exertional level, who could have occasional contact with the general public and coworkers, and possessed the requisite skills could perform work as an auto mechanic. R. at 63.  The VE affirmed that such a person would be capable of performing that work. *Id.*  The VE then stated that this hypothetical person could be one of the following: (1) a janitor, with 38,540 jobs available in Indiana and 1.4 million available nationwide; (2) an order filler, with 1,190 jobs available in Indiana and 165,180 available nationwide; or (3) dishwasher, with 2,960 jobs available in Indiana and 221,483. *Id.*

The V.E. further stated that even if the hypothetical person could have only inconsequential or superficial contact with the public, meaning sustained conversations, i.e. a ticket taker, it would not affect the jobs identified. R. at 63-64.

The V.E. also testified that if the hypothetical person could only can stand or walk for up to four hours in an eight-hour workday and can sit for up to a total of six hours in

an eight-hour workday, he would not be able to be an auto mechanic or any of the other jobs listed above. R. at 64.  The V.E. stated that because of the four-hour limit on standing and walking, the whole light exertional level – including the entire mechanic field – was precluded. *Id.*

The V.E. also testified that, as for supervision, an auto mechanic might only need a checkup in the morning and afternoon, but in general there is "not going to be a lot of interaction." R. at 63-64.  With unskilled work, the supervision increased and would occur a couple times in the morning and afternoon. R. at 65.

Finally, the V.E. concluded that in order to engage in full-time competitive work, a person must be able to perform at least at ninety-five percent productivity during an eight-hour workday, not including the typical morning, lunch, and afternoon breaks. *Id.*

## E.  RELEVANT ASPECTS OF THE ALJ'S DECISION

The ALJ found that Graham met the disability insured status requirements through December 31, 2013, and that Graham had not engaged in substantial gainful activity since July 15, 2008, the alleged onset date. R. at 24.  The ALJ then determined that Graham's personality disorder with avoidant paranoid features, dysthymic disorder, generalized anxiety disorder, history of alcohol abuse, and lumbar degenerative disease were severe as defined in 20 C.F.R. 404.1520(c) and 416.920(c). R. at 24-25.  The ALJ deemed Graham's left leg condition and wound non-severe. R. at 25.

### 1.  Graham's Left Leg Condition and Wound are Non-Severe

The ALJ concluded that Graham's left leg peripheral neuropathy, bilateral peripheral artery disease, and left leg non-healing wound, however, were non-severe medically determinable impairments. *Id.*  Graham had SFA recanalization and stenting

12

on both legs in November 2011 due to claudication and bilateral peripheral artery disease. *Id.* Nonetheless, Graham reported complete resolution of his bilateral lower extremity claudication pain in December 2011 and June 2012. *Id.* The ALJ determined that even though Graham complained of left leg pain in January 2013, a scan of which revealed complete occlusion, he was not admitted to the VA clinic until March 29, 2013 for treatment. *Id.* Follow-up testing in May 2013 illustrated that Graham's leg had no evidence of stenosis in the area visualized and significant improvement in ABI. *Id.* Graham did begin to experience problems with the left leg non-healing wound and was admitted to the VA clinic in August 2013 for a left lower extremity bypass graft angioplasty and left lower extremity wound biopsy. *Id.* Following this intervention, Graham's ABI significantly improved. *Id.* In a November 2013 follow-up, Graham reported that mefanide and aspirin controlled his pain.

From December 11 to 12, 2013, Graham was admitted to the VA clinic for administration of antibiotics due to left leg swelling and for his non-healing surgical wound. *Id.* A December 11, 2013, EMG revealed evidence of an axonal sensorimotor peripheral neuropathy. The ALJ concluded, however, that the "peripheral neuropathy does not satisfy the 12-month durational requirement to constitute a severe impairment, and overall, the claimant's peripheral artery disease has been well-maintained with his stenting procedures." *Id.* The ALJ found that, although some issues with healing of the left leg existed, "this has been only after his March 2013 surgery, which also did not satisfy the 12-month durational requirement as of the date of the hearing." *Id.* The ALJ determined that the impairments were non-severe and had no more than a minimal impact on his ability to perform basic work activities. *Id.* The ALJ concluded that "[w]hile

13

the claimant has had some issues with his non-healing left leg surgical wound, this has been only after his March 2013 surgery, which also did not satisfy the 12-month durational requirement as of the date of the hearing." *Id.* Moreover, provided the most recent medical records from February 2014, "indicate that there was no evidence of infection in his left leg." *Id.* Thus, the ALJ deemed the left leg impairments non-severe, as they have no more than a minimal impact on Graham's ability to perform basic work activities *Id.*

### 2. Residual Function Capacity – Medium Exertional Level

The ALJ found that Graham had the residual functional capacity to work at the medium exertional level.  He concluded that Graham could have inconsequential or superficial contact with the general public and could perform productive work tasks for up to an average of 98 to 100% of an eight-hour work day, excluding typical breaks. R. at 26.  In making this determination, Graham considered both the physical and mental impairments alleged by Graham.  As already noted, the ALJ found the non-healing left leg wound and use of a wound VAC as non-severe impairments. R. at 27.  The ALJ also considered Graham's poor memory, dislike of strangers and crowds, as well as issues with trusting others. *Id.*  Graham also testified that he is on three medications for depression, which he rated as an eight out of ten. R. at 27, 29.[4]  Nonetheless, the ALJ noted that the most recent medical records indicated that his mood and concentration had significantly improved and the medications kept him on "an even keel." R. at 29.  Moreover, Graham's alcohol dependence had drastically improved as he quit cold turkey in June 2013. *Id.*

---

[4] The bates stamped page numbers 27 and 28 were provided in the incorrect order, resulting in the following sequential pages: 26, 28, 27, and 29.

The ALJ also considered Graham's physical abilities in making his assessment, noting that prior to his leg surgeries in 2011, Graham could walk three-quarters of a block, stand for twenty minutes, and lift twenty pounds. *Id*.  As of the date of the hearing, Graham could only walk fifty feet, could not stand for twenty minutes, and could sit variably between ten minutes and an hour. *Id*.  Graham also stated that his pain level is at a five with medications and that he has side effects of constipation and lack of appetite. *Id*.  And while Graham indicated that he could no longer perform automobile work, the ALJ noted that he performed such work after the alleged onset date as well as work at the Moose Lodge. *Id*.

The ALJ believed Graham was partially credible. *Id*.  He believed that two factors weighed against considering the allegations to be strong evidence favoring a finding of severely limited functioning. *Id*.  He stated, "First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." *Id*.  He continued, "Secondly, even if the claimant's daily activities are as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the medical evidence and other factors discussed in this decision." *Id*.

The ALJ determined that the extent of Graham's symptoms and limitations were not supported by medically acceptable clinic and diagnostic techniques. *Id*.  The ALJ also concluded that the symptoms and limitations could not be reinforced by the records of the treating and examining healthcare professionals. *Id*.  Furthermore, the ALJ held, there was insufficient objective medical evidence to establish that the impairments "are of such severity that they can reasonably be expected to give rise of the alleged limitations." *Id*.

15

In reviewing Graham's physical condition, the ALJ found that his records show that he did not seek any ongoing treatment for physical conditions other than his non-severe impairments and some routine health concerns. R. at 30. He noted that the first physical consultative examination was on November 2010, more than two years after the July 15, 2008 onset date. *Id.* And while the examiner at the November 2010 consult believed Graham may have difficulty performing at a job that required walking, strenuous activity, or standing for long periods of time, the ALJ gave "this medical source statement little weight, as the exam was generally unremarkable." *Id.* The ALJ found that the physical consultative examination in August 2012 was also unremarkable, as the majority of the allegations were mental in nature. *Id.* And though a January 2013 x-ray revealed mild multilevel degenerative changes of the lumbar spine most pronounced at L1-L2 and L2-L3, there was no evidence that Graham sought any medical treatment for this condition. The ALJ viewed the lack of treatment for his back was indicative of how it affected Graham's functioning. *Id.* Accordingly, the ALJ found that Graham was capable of medium exertional work. *Id.*

The ALJ next examined Graham's medical records with respect to his mental impairments. R. at 30. The mental impairments included personality disorder with avoidant and paranoid features, dysthymic disorder, generalized anxiety disorder, and a history of alcohol abuse. *Id.* The first documented record involving Graham's mental impairments was his psychological consultative examination in November 2010, which was more than two years after his alleged onset date. *Id.* The ALJ noted the heavy drinking as well as the depression and paranoia Graham experienced, but also noted that he had not been seeking any psychiatric treatment for these problems. R. at 30-31. The

examiner found that Graham was capable of performing self-care activities. R. at 31.  The examiner gave Graham a GAF score of 60. *Id*.  The ALJ noted "that the claimant's longitudinal GAF scores range from 45 to 55 and then up to an improved GAF score of 58 to 60 with continuous mental health treatment after he began treatment through the Department of Veterans Affairs." *Id*.

The ALJ next reviewed records from the Indianapolis VA clinic, starting with a November 2011 medication management with psychiatrists as well as therapy. *Id*. The ALJ stated that the records show a progression of improvement with psychotropic medication. *Id*.  In January 2012, Graham believed everything was better and that his medication was effective. *Id*.  He also indicated that his paranoia was improving when he utilized various medications.  In July 2012, Graham informed that "Zoloft put him on an even keel and that irritability was not an issue." *Id*.  The ALJ also noted that Graham was diagnosed with Axis I dysthymia, alcohol abuse, nicotine dependence, and caffeine dependence, as well as an Axis II diagnosis of paranoid personality disorder and a GAF of 55. *Id*.  Nonetheless, the ALJ concluded that while "the claimant continued to have some ongoing complaints, psychiatrist records show improvement of symptoms overall." *Id*.  Therapy notes also indicated improvement, with a reduction in alcohol consumption and less anger, volatility, and paranoia. R. at 31-32.  The ALJ also considered Graham's part-time work repairing cars and working at the Moose Lodge, for which he concluded that "[t]his work suggests that the claimant was not as limited as alleged during this timeframe, and the evidence of record reveals that he had some improvement in his mental symptoms with treatment." R. at 32.

The ALJ then reviewed records from Graham's August 2012, psychological consultative examination. *Id.*  During the examination, Graham indicated that he never had friends, does not let people get close to him, and that he has an ongoing depressed mood and difficulty enjoying himself. *Id.*  He also exhibited symptoms of psychomotor retardation, but stated that his sleep had improved with medication. *Id.*  His memory was within the average range. *Id.*  The ALJ noted that Graham reported only drinking once per week, which is in "direct contradiction to his prior consultative examination." *Id.*  The examiner gave Graham DSM-IV diagnoses of personality disorder with avoidant and paranoid features, dysthymic disorder, generalized anxiety disorder, and a history of alcohol abuse as well as a GAF score of 58. *Id.*  The examiner indicated that Graham "is able to learn, remember, and comprehend simple instructions; to attend to conversation and respond appropriately and timely, with concentration remaining intact during more cognitively demanding tasks; and that he would not experience difficulty handling routine changes at work." *Id.*  He concluded that Graham's main source of dysfunction was his profound social detachment, which would make it difficult to manage relationships with coworkers and clients. *Id.*  The ALJ provided significant weight to this examiner's "assessments regarding the GAF score and medical source statement, as they are generally consistent with the claimant's longitudinal mental health records." *Id.*

The ALJ noted that Graham continued to seek treatment of his mental impairments with the VA clinic throughout 2012 and 2013, and into January 2014. *Id.*  During this time he exhibited a reduced desire to drink and stated that Risperdal kept his auditory and visual hallucinations at bay. *Id.*  In March 2013, "he was noted to be logical and a little more conversant, an in June 2013, his GAF score improved to 58." *Id.*  Also in June,

Graham described being "on a nice even keel," stated that he slept seven hours a night, his judgment had improved since reduction in smoking and drinking, and indicated some improvement on Wellbutrin and Remeron. *Id.* Graham testified at the hearing that he quit "cold turkey" in June 2013, which was confirmed in a January 2014 therapy note. *Id.* Finally, the ALJ examined the records for Graham's January 2014 psychiatric visit. R. at 32-33. The examiner provided him an improved GAF score of 60 and noted that Graham was doing quite well from a mood standpoint. *Id.* The examiner also stated that his depression and anxiety were both well managed. R. at 33. She noted that Graham reported that his concentration was good when he was not in pain from his leg and that he wakes up feeling refreshed. *Id.* The examiner believed claimant's affect was noticeably brighter, that he was much more conversant and spontaneous, and that he exhibited fair judgment. *Id.*

Following review of the medical records, the ALJ concluded that Graham's "mental symptoms and limitations improved significantly with psychotropic medications and therapy." *Id.* Nonetheless, "in light of the record as a whole, the [ALJ] accommodated the claimant's severe mental impairments, in particular his paranoid features, by finding that he can have inconsequential or superficial contact with the general public (i.e., no sustained conversations, e.g. ticket takers)." *Id.* Accordingly, the ALJ found that Graham could perform productive work tasks for up to an average of 98 to 100% of an eight-hour workday, not including typical breaks. *Id.*

The ALJ then noted that he accorded significant weight to the mental assessments provided by the state disability determination medical professionals. *Id.* In doing so, he found that their conclusions regarding the nature and severity of Graham's mental

19

impairments were deemed expert opinion evidence from a non-examining source and their opinions were consistent with the treatment records. *Id.*

Finally, the ALJ explained his rationale for determining the residual functional capacity, stating that the exertional level was based on the mild lumbar degenerative disc disease. He referenced the fact that Graham never sought treatment for this issue, which he found to be indicative of the extent that it affects his functioning. R. at 34. The ALJ also concluded that Graham's "statements regarding the intensity, persistence and limiting effects of his symptoms are not fully credible, especially in light of the medical records that show only mild lumbar spine degenerative disc disease with no treatment and significant improvement in his mental impairments with mental health treatment." *Id.* The ALJ opined that Graham's allegations regarding difficulty with daily activities are "simply not fully supported by the evidence of record as a whole." *Id.*

## II. STANDARD

To be eligible for DIB or SSI,[5] a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A). To determine whether or not a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

    I.      If the claimant is employed in substantial gainful activity, the claimant is not disabled.

---

[5] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1505 *et seq.* The SSI regulations are substantially identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq.* For convenience, only the DIB regulations are set forth herein.

II.     If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

III.    If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

IV.     If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

V.      If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, but then it shifts to the Commissioner at the fifth step.  *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits.  When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner.  *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).  This Court will sustain the ALJ's findings if they are supported by substantial evidence.  42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673; *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999).  "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Craft*, 539 F.3d at 673 (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).  In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ.  *Nelson*, 131 F.3d at 1234.

The ALJ "need not evaluate in writing every piece of testimony and evidence

21

submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  *See also*, *Craft*, 539 F.3d at 673.  Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).  *See also*, *Craft*, 539 F.3d at 673 (stating that not all evidence needs to be mentioned, but the ALJ "must provide an 'accurate and logical bridge' between the evidence and the conclusion" (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004))).  An ALJ's articulation of his analysis enables the Court to "assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review." *Craft*, 539 F.3d at 673.

### III. <u>ANALYSIS</u>

#### 1. <u>Consideration of Graham's Left-Leg Symptoms</u>

Graham first contends that the ALJ erred in concluding that his peripheral artery disease, peripheral neuropathy, and non-healing left leg wound were not severe impairments. Dkt. 16 at 12.[6]  The ALJ concluded that at the time of the hearing, Graham's left leg wound did not qualify as severe BECAUSE it did not satisfy the twelve month durational requirement as of the date of the February 2014, at which time the wound would have been present for approximately eleven months. R. at 25.  Graham maintains that the ALJ failed to consider whether the left leg wound could be expected to last for the twelve month requirement period. Dkt. 16 at 12.  Graham states that the records

---

[6] All page numbers cited herein refer to the ECF page number, which appears at the top of each document filed; the page number may or not correspond to the page number supplied by the filing party.

indicate that as of the most recent record from February 11, 2014, Graham's leg wound had not at all improved. *Id.* at 13.  Graham further argues that it would be "entirely reasonable to believe that his condition would likely remain for the four mere weeks that would be necessary to meet the 12-month durational requirement." *Id.* He also notes that the ALJ's decision was issued on May 23, 2014, and that no record of improvement had been made during that time. *Id.*  Finally, Graham asserts that the ALJ failed to consider the combined effects of Graham's numerous impairments in determining his residual functional capacity. *Id.* at 17.

None of Graham's arguments have merit.  An impairment is deemed "severe" when such impairment "significantly limit[s] [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521.  As noted above, such an impairment must have lasted or can be expected to last for a continuous period of not less twelve months. 42 U.S.C. § 423 (d)(1)(A).  This determination is made at step-two in the process, at which stage the claimant bears the burden of proof. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

Graham argues that the ALJ failed to adequately consider whether the left leg wound could be expected to last for an additional four weeks to qualify under the twelve month threshold.  But such an inquiry fails to recognize that it is the claimant's burden to prove this step (step two) of the process. *See Id.* ("The claimant bears the burden of proof at steps one through four.").  Yet even if the burden was on the Commissioner to make such a determination, it would amount to nothing more than mere speculation.  Graham has cited to no evidence in the record that would affirmatively establish that the wound was still an impairment through March 2014.  Nor has he sought to introduce any

additional material evidence that would inform the Court of the condition of the leg as of March 2014. *Cf. Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012) (42 U.S.C. § 405(g) provides that a reviewing court may consider additional evidence "only upon a showing that there is new evidence which is material.").  The ALJ went so far as to warn Graham and his counsel at the hearing that "My problem is the duration requirements.  He has had ongoing treatment.  He hasn't passed the twelve months yet from what I've seen." R. at 46.  Nonetheless, Graham's attorney failed to present evidence that would indicate this wound was likely to subsist through March in order to qualify under the twelve month durational requirement. *See* R. at 60.  Graham even admitted that he did not know the date of his next appointment with respect to the leg. *Id*.

Graham also claims that there is "no indication anywhere in the record that there was any improvement or even signs of potential improvement before the ALJ's decision was issued." Dkt. 16 at 17.  The record reflects otherwise.  The ALJ found that the peripheral artery disease was well-maintained through stenting procedures. R. at 25.  He also noted that the latest medical record from February 2014 indicated that there was no evidence of infection in the left leg, which could certainly be construed as an improvement on the leg's condition. *Id*.  Clearly, the ALJ considered the condition of the left leg in making his determination and stated as much in his opinion.

Finally, Graham argues that the ALJ failed to consider the peripheral artery disease, peripheral neuropathy, and non-healing left leg wound in determining his residual functional capacity. Dkt. 16 at 18.  The record once again reveals otherwise.  The ALJ, in making his determination for the residual functional capacity, found that the issues with Graham's lower extremities were non-severe and had no more than a minimal impact

24

of Graham's ability to work. R. at 30.  He previously considered the extent of Graham's left let in determining its severity and found it non-severe, a finding that was not solely made on the basis of the durational requirement. R. at 25.  The ALJ essentially incorporated his findings at step two into his findings with respect to the residual functional capacity.  He stated in his findings for residual functional capacity that "[w]hile [Graham] reported some issues with his lower extremities, as noted above, these impairments are non-severe and have no more than a minimal impact on the claimant's ability to perform basic work activities." R. at 30.  The ALJ's incorporation of his previous analysis regarding Graham's leg issues is sufficient to support the ALJ's conclusion regarding Graham's residual functional capacity. *See Rice v. Barnhart*, 384 F.3d 363, 370 n. 5 (7th Cir. 2004) ("it is proper to read the ALJ's decision as a whole, and … it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five").

### 2.  Mental Residual Functional Capacity

The ALJ found that Graham "has the residual functional capacity to work at the medium exertional level.  He can have inconsequential or superficial contact with the general public (i.e., no sustained conversations, e.g. ticket taker).  He can perform productive work tasks for up to an average of 98 to 100% of an 8-hour workday, not including the typical morning, lunch, and afternoon breaks." R. at 27.  The ALJ concluded that Graham exhibited moderate limitations in social functioning and therefore found that he could have inconsequential or superficial contact with the general public. R. at 33. There is substantial evidence in the record to support the ALJ's finding.

Graham argues that the limitations set forth in the ALJ's findings are not supported by the evidence and findings of the medical experts to whom he provided significant

weight. Dkt. 16 at 19.  Graham further asserts that the ALJ failed to adequately assess his social limitations and incorporate them into the residual functional capacity finding. *Id.* Moreover, Graham contends that the ALJ failed to consider Graham's difficulty interacting with others, including authority figures and coworkers." *Id.* at 19-20.

The ALJ afforded significant weight to the August 2012 examiner's opinion and noted both the strengths and weaknesses of Graham's condition. R. at 26.  He noted that the examiner found Graham's "main source of dysfunction lies in his profound social detachment, which would make it difficult to appropriately manage relationships with coworkers and clients. *Id.*

The ALJ found that, despite these limitations, Graham's mental impairments had generally improved since he began seeking treatment and taking medication. R. at 32-33.  Since undergoing treatment, his mental impairments improved, resulting in seven hours of sleep each night as well as a decrease in cigarette and alcohol consumption. R. at 32.  He also noted that Graham reported in June 2013 that he was "on a nice even keel." *Id.*  Finally, in his most recent mental health record from February 2014, Graham received an improved GAF score of 60, was doing quite well from a mood standpoint, and had properly managed his depression and anxiety. R. at 32-33.  The doctor also noted that Graham's "affect was noticeably brighter, he was much more conversant and spontaneous, and he was noted to have fair judgment." R. at 33.  The ALJ concluded that the "objective records reveal that the claimant['s] mental symptoms and limitations improved significantly with psychotropic medications and therapy." *Id.*

Although the ALJ did not verbatim adopt the residual functional capacity limitations set forth by the consultative psychologist, he nonetheless supported his reasoning with

substantial evidence. Moreover, the determination of the residual functional capacity is within the sole province of the ALJ. 20 C.F.R. § 404.1527(d)(2).  In doing so, he must consider the entire record to determine what the claimant is capable of performing and the ALJ did so here. 29 C.F.R. § 404.1527(a).  Furthermore, it is the duty of the ALJ, not the Court, to weigh evidence, resolve material conflicts, make independent findings of fact, and determine the outcome of the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971); *Ehrhart v. Sec'y of HHS*, 969 F.2d 534, 541 (7th Cir. 1992) ("resolution of evidence conflicts lies within the exclusive domain of the ALJ").  In the instant case, the ALJ considered substantial evidence in determining Graham's residual functioning capacity.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, the Court concludes that Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, did not err in her decision to deny Plaintiff James Graham's applications for Disability Insurance Benefits and Supplemental Security benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416, 423, & 1382c.  Accordingly, this Court **AFFIRMS** the Commissioner's decision.  The Court will enter judgment accordingly.

IT IS SO ORDERED this 22d day of November, 2016

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov